B. W. KING, INC., A NEW YORK CORPORATION, PLAINTIFF-RESPONDENT, v. THE TOWN OF WEST NEW YORK, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT.

HUDSON PROPERTY ASSOCIATES, INC., A NEW JERSEY CORPORATION, AND HARBOR TANK STORAGE CO., INC., A NEW YORK CORPORATION, PLAINTIFFS-RESPONDENTS, v. THE TOWN OF WEST NEW YORK, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT.

MANTANK CORPORATION, A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT, v. THE TOWN OF WEST NEW YORK, A MUNICIPAL CORPORATION OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued January 23, 1967—Decided May 22, 1967.

*Mr. John H. Yauch* argued the cause for plaintiffs-respondents, *Hudson Property Associates, Inc.,* and *B. W. King, Inc.* (*Messrs. Yauch & Fagan,* attorneys).

*Mr. William F. Harth* argued the cause for plaintiff-respondent, *Harbor Tank Storage Co., Inc.* (*Messrs. Harth & Enright,* Attorneys).

*Mr. Robert H. Wall* argued the cause for defendant-appellant.

The opinion of the court was delivered by

HANEMAN, J. Plaintiffs sought the recovery of damages to their respective properties resulting from a fire which had its origin on lands owned by defendant. The jury having returned a verdict for plaintiffs, defendant moved for a judgment notwithstanding the verdict or in the alternative for a new trial. The trial court granted defendant's motion for judgment notwithstanding the verdict and granted the motion for a new trial conditionally, if the entry of that judgment should be reversed on appeal. Upon appeal, the Appellate Division reversed, reinstating plaintiffs' verdicts. This Court granted certification upon defendant's petition. 47 *N. J.* 424 (1966).

The facts as disclosed on the trial are as follows: On June 5, 1959 defendant held a $500,000 tax lien on certain lands then owned by the receivers of the New York, Ontario and Western Railway Co. In order to protect this lien, the defendant purchased the said lands at a public sale. The property was composed of two piers extending into the Hudson River and some adjacent high land. The piers consisted of an open lattice work trestle 30 feet high and 50

feet wide which extended 400 feet inland and a similar distance into the river. They were built for loading coal barges but had not been used for that purpose for at least 15 years.

Evidence as to the physical condition of the piers indicated that the wood was old and dry and in sections rotted and decayed. The state of disrepair was such that at least two persons had fallen through rotted or loose boards.

There was testimony that there was no "housekeeping" practiced on the piers, i. e., that there existed wood debris, lumps of coal and coal dust thereon and that it had been brought to the attention of the municipality that people frequently trespassed on the piers. Although the area was visited every one-half hour by a police patrol car, the town neither maintained a watchman on the premises nor required a police officer to go thereon. There was a fire alarm box on the land near the piers but no such alarm nor any fire fighting or prevention equipment was available upon the piers. There was no fence or other means adopted to prevent access to the piers. The defendant did, however, post "no smoking" signs. Barges were permitted to tie up to the piers for a fee of $1.50 per day.

On August 18, 1961 three teenage boys were trespassing on the southerly pier when one of them threw a lighted cigarette into a coal hopper. Shortly thereafter they noticed smoke in the vicinity of the hopper and discovered that a wooden beam was on fire. When they saw that they could not extinguish the fire they fled. Defendant's fire department was immediately thereafter notified. The fire rapidly consumed the piers and spread to adjoining real and personal property which plaintiffs owned.

Plaintiffs argue that the defendant municipality was engaged in a proprietary function in its ownership and management of the piers and was hence subject to liability. Plaintiffs proceed to rationalize that in the performance of this proprietary function, defendant breached its duty of reasonable care to prevent the spreading of fire to the property of others by failing to furnish adequate care, supervision and management

of the property. The reason for plaintiffs' categorization of defendant's function as proprietary in connection with the pier ownership and management lies, of course, in the desire to avoid the necessity of proof of active wrongdoing and to bring defendant's conduct within the scope of municipal liability for torts on ordinary principles of negligence for failure to act. *Schwartz v. Borough of Stockton,* 32 *N. J.* 141 (1960).

The first problem, therefore, is whether defendant was under any duty. In fixing municipal liability for torts there has been a more or less blind adherence to the municipal proprietary-governmental distinction, without a real consideration of the reasons which gave birth to that doctrine and of whether, in the light of the general expansion of municipal activity, the doctrine has not outlived its usefulness. Municipal immunity from tort liability and the proprietary-governmental test have fallen into considerable disrepute. There is a consensus that most of the reasons for immunity have expired and that municipal liability should be subject to less restrictive limits. Further discussion of this topic is unnecessary because of past able discussion thereof. *McAndrew v. Mularchuk,* 33 *N. J.* 172 (1960) ; *Cloyes v. Delaware Twp.,* 23 *N. J.* 324 (1957) ; *Taylor v. N. J. Highway Authority,* 22 *N. J.* 454 (1956) ; Borchard, "Government Liability in Tort," 34 *Yale L. J.* 1, 129, 229 (1924–25) ; Davis, "Tort Liability of Governmental Units," 40 *Minn. L. Rev.* 751 (1956) ; 3 *Davis, Administrative Law,* § 25.07 (1958) ; 2 *Harper and James, Law of Torts,* § 29.6 (1956) ; 18 *McQuillin, Municipal Corporations* (*3d ed.* 1963), § 53.24a; *Prosser, Torts* (*2d ed.* 1964), § 109.

■ The difficulty with the articulation of a substitutionary rule lies in the ascertainment and expression of a perimeter for liability. It is most difficult if not impossible to academically visualize all the possible sets of circumstances which could give rise to a claimed municipal liability. There results an inability to state in advance a positive standard for that purpose. We have, however, recognized that certain municipal activities, regardless of how defined and tested, should

continue to be immune from tort liability. *Visidor Corp. v. Borough of Cliffside Park,* 48 *N. J.* 214 (1966) ; *Hoy v. Capelli,* 48 *N. J.* 81 (1966) ; *Fitzgerald v. Palmer,* 47 *N. J.* 106 (1966) ; *Amelchenko v. Borough of Freehold,* 42 *N. J.* 541 (1964). The foregoing would perhaps be best resolved by legislative action. (See, *e. g., R. S.* 40 :9–2.) However, in the absence of such action, we cannot and should not refuse to act. The problem should be approached by the court on a gradual case by case basis, permitting a new theory to metamorphize slowly. A firm rule can evolve with additional experience. The analytical approach ought not to be one of asking why immunity should not apply in a given situation but rather one of asking whether there is any reason why it should apply.

The case *sub judice* is a classical example of the confusion which beclouds the issue under the traditional approach. The defendant acquired and held title to the premises solely in aid of its tax collecting power. The collection of taxes by a municipality has been held to be a governmental function. *Muller v. Bayonne,* 45 *N. J. Eq.* 237 (*E. & A.* 1888) ; *Plunkett's School for Boys v. City of Thomasville,* 178 *Ga.* 625, 173 *S. E.* 656 (*Sup. Ct.* 1934) ; *City of San Angelo v. Deutsch,* 126 *Tex.* 532, 91 *S. W. 2d* 308 (*Sup. Ct.* 1936) ; *Black v. Baker,* 130 *Tex.* 454, 111 *S. W. 2d* 706 (*Comm. App.* 1938) ; 18 *McQuillin, Municipal Corporations* (*3d ed.* 1963), § 53.54. On the other hand, defendant permitted vessels to tie up to the piers as had its individual predecessor in title for the nominal charge of $1.50 per day. The operation of a dock or pier with the charge of a fee or toll for wharfage has been held to be a proprietary function. *Leemon v. South Jersey Port Commission,* 145 *F. Supp.* 828 (*D. N. J.* 1956) ; *City of Orange, Tex. v. Lacoste, Inc.,* 210 *F. 2d* 939 (5 *Cir.* 1954) ; *City of Shawnee v. Faulkner,* 205 *Okl.* 647, 240 *P. 2d* 100 (*Sup. Ct.* 1952) ; *Heftiman v. Lake City,* 225 *Minn.* 117, 30 *N. W. 2d* 18 (*Sup. Ct.* 1947) ; 63 *C. J. S. Municipal Corporations* § 911. The activity of the municipality, therefore, could

logically be classified as either proprietary or governmental by applying classical tests under the foregoing authorities. Realistically, the purpose of the acquisition of title was not to furnish any public service therewith but rather for the collection of past-due taxes by the eventual sale of the premises. We can find no logical reason why the municipality should not be subject to the same duties and liabilities in relation to surrounding properties as are incurred by individuals in the ownership of realty, whether the capacity in which title to the real estate held by the municipality is denominated proprietary or governmental. 18 *McQuillin, Municipal Corporations* (1962), § 53.90. Rather than to base liability upon a finding that the municipality's function in connection with this land was either proprietary or governmental and to compound the confusion, we prefer to determine that where as here a municipality has acquired title to realty in furtherance of its taxing power and duty, and such land is not being actually employed or used for a public municipal purpose, the municipality has the same duties and liabilities in connection with the prevention of the spread of fire originating on such lands as have private land owners. In this manner we do not add to the perpetuation of the controversial dichotomy.

It becomes necessary, therefore, to ascertain what duty a private individual has with respect to a fire originating on his property. Plaintiffs' case was tried upon the theory that defendant did not exercise due care in the steps which it took to prevent a conflagration. They argue that defendant was guilty of negligence in (1) failing to exercise reasonable care in guarding against the intervening negligent acts of strangers on the piers, and (2) creating a fire hazard because of the age, dryness and flammability of the structure, and (3) permitting an unsafe and dangerous condition to exist, by failing to keep the pier clear of coal dust and similar flammable material.

■ Although the common law rule was to the contrary, a land owner's liability for the spread of a fire originating

on his property must ordinarily be predicated upon negligence. *Menth v. Breeze Corporation, Inc.*, 4 *N. J.* 428 (1950); *Conrad v. Gerber,* 106 *N. J. L.* 158 (*E. & A.* 1929); *Lefeber v. Goldin,* 17 *N. J. Super.* 422 (*App. Div.* 1952). In *Menth, supra,* this Court said at 4 *N. J., pp.* 439–440 in connection with a fire started by a trespasser:

"It is the settled rule that the owner of property is not liable for the spread of a fire which is accidentally started thereon by the act of a stranger or by some other cause with which he is not connected, unless he is guilty of negligence in respect to the condition of his premises or in failing to prevent the spread of the fire, after he has notice of the existence of the fire on his premises. * * * However, if an owner or occupier by reason of his negligence has kept his premises in an unsafe and dangerous condition, as by the accumulation of inflammable material thereon so as to create a fire hazard to adjoining property in the event such material becomes ignited, such negligent owner or occupier may be held answerable for the damage caused by the spread of the fire even though such fire may have been started by the act of a third person or independent agency or any unauthorized act, if such act was reasonably foreseeable as the natural and probable consequence of the negligent manner in which the premises were kept. The intervening negligent acts of strangers or intruders which might start a fire communicated to adjoining premises may constitute a danger which such owner or occupant reasonably should have contemplated and guarded against."

An owner is therefore not ordinarily liable for a fire started by a trespasser. It is only where the premises are in an unsafe and dangerous condition or the owners fail to take reasonable means to prevent the spread of fire that liability for the acts of a stranger arises. The phrase "reasonable means to prevent the spread of fire" as applied to a vacant, unused building does not ordinarily encompass the furnishing of fire extinguishers or other similar preventative instruments. Nor does it require any further action on the part of the owner upon obtaining notice of the existence of a fire than alerting the proper public authority charged with the duty of extinguishing fires. The fact that here, a municipality is the owner of the premises upon which the fire started, is no basis to suggest that the failure of its fire

department to extinguish the conflagration was an act of negligence on the municipal owner's part. The private owner of property, whether vacant or occupied is under no duty to guard against the acts of strangers, except perhaps to notify the municipal authorities, where he has notice of trespassers invading the premises, and is under no duty to prevent trespassing thereon. *Mehl v. Carter,* 171 *Kan.* 597, 237 *P. 2d* 240 *(Sup. Ct.* 1951) ; *Aune v. Oregon Trunk R. Co.,* 151 *Or.* 622, 51 *P. 2d* 663 *(Sup. Ct.* 1935) ; 22 *Am. Jur., Fires,* § 11.

The word "condition" in *Menth, supra,* contemplates an unusually hazardous situation affirmatively created or maintained by the owner which gives rise to an extraordinary and undue risk of combustibility. This situation must arise from a cause other than the mere age of the building. Research has disclosed no case which has held that an owner of a building constructed of material whose flammability increased by the passage of time, as for instance by the aging of wood, was under any duty to replace the material thus rendered easier of ignition or to exercise any greater degree of care to prevent trespassers from starting a fire than would the owner of a new building.

Generally it would arise from the type of use to which the building is put and either the resulting accumulation of flammable material therein or the increase of the flammability of the structure itself, from the use to which it was put. It follows that there is a duty not only to take reasonable precaution to prevent the ignition of the product of the activity conducted on the premises but also to prevent the ignition of the by-product of such activity. In connection with the latter, a reasonable amount of "housekeeping" should be undertaken for the safe disposal and removal of flammable by-products. *Menth v. Breeze Corporation, Inc., supra; Reid & Sibell, Inc. v. Gilmore & Edwards Company,* 134 *Cal. App. 2d* 60, 285 *P. 2d* 364 (1955) ; *Standard Oil Co. of New Jersey v. Midgett,* 116 *F. 2d* 562 (4 *Cir.* 1941) ; 22 *Am. Jur., Fires,* § 12.

In the matter *sub judice,* the issue of "housekeeping" was interjected into the case by plaintiffs who adduced allegedly expert testimony on what was customary in that connection on piers in active commercial use. The error in admitting such testimony lies not in the admission of expert testimony but rather in the fact that here we are concerned with a vacant, unused, ex-coal pier and there was no proof of the degree of "housekeeping," if any, which was the recognized standard on such piers.

The factual issues therefore are (1) whether the flammability of the pier was increased by the accumulation of the by-products of its use for coal loading and whether a reasonably prudent man would have employed some method of "housekeeping" to remove or eliminate any such and any other flammable material, and (2) whether defendant advised its police authorities of the presence of trespassers or these authorities had notice thereof.

In the light of the fact that this matter was not tried under the above guide lines and the charge did not contemplate the above theses, the judgment of the Appellate Division will be reversed and the case remanded for a new trial.

*For reversal* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, HALL, SCHETTINO and HANEMAN. — 6.

*For affirmance* — None.